## IN THE UNITED STATES DISTRICT COURT FOR THE

## WESTERN DISTRICT OF OKLAHOMA

**FILED**

JUN 0 3 2020

CARMELITA REEDER SHINN, CLERK
U.S. DIST. COURT, WESTERN DIST. OKLA.
BY_____,DEPUTY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | **CR 20-121 C** |
| | ) | No. _____ |
| -vs- | ) | |
| | ) | Violations: 18 U.S.C. § 1344 |
| RONALD J. McCORD, | ) | 18 U.S.C. § 1014 |
| | ) | 18 U.S.C. § 1957(a) |
| Defendant. | ) | 18 U.S.C. § 982(a)(1) |
| | ) | 18 U.S.C. § 982(a)(2) |
| | ) | 28 U.S.C. § 2461 |

### I N D I C T M E N T

The Federal Grand Jury charges:

### Introduction

At all times relevant to this Indictment:

1.     **RONALD J. McCORD** was the Chairman and founder of First Mortgage Company, LLC ("FMC"), a mortgage lending and loan servicing company with offices in Oklahoma City, Oklahoma; Omaha, Nebraska; and elsewhere.

2.     NBC Bank was a financial institution with offices throughout Oklahoma.   FMC maintained two bank accounts at NBC: (1) a clearing account containing borrower payments and other income, account number xx0016 ("the clearing account"); and (2) an operating account used to pay FMC's business

expenses, including rent, payroll, and utilities, account number xx9290 ("the operating account").    **McCORD** was a signatory on both accounts.

3.    First National Bank of Omaha ("FNB") was a financial institution chartered and headquartered in Omaha, Nebraska.    FMC maintained fourteen bank accounts at FNB, including account number xx6269, which contained borrower payments on mortgages that closed ("the closing account").

4.    The Federal National Mortgage Association ("Fannie Mae") was a government-sponsored enterprise that purchased loans from mortgage lenders—including FMC—packaged those loans with other loans, and sold the loan packages to investors as mortgage-backed securities on the open market.

5.    The Federal Deposit Insurance Corporation ("FDIC") was an independent agency created by the U.S. Congress to maintain stability and public confidence in the nation's financial system by, among other things, examining and supervising financial institutions for safety and soundness and consumer protection.

6.    The Oklahoma State Banking Department ("OSBD") was an agency created by the Oklahoma Constitution to supervise state-chartered banks, credit unions, trust companies, savings associations, money order companies, and money transmission companies.    OSBD shared supervision with the FDIC

and other federal bank regulators to ensure that state-chartered institutions were making safe and sound lending decisions and protecting the deposits of their customers.

## Residential Warehouse Lending

7.    Spirit Bank ("Spirit") and Citizens State Bank ("Citizens") were state-chartered financial institutions insured by the FDIC that conducted business throughout the State of Oklahoma.   Citizens and Spirit were known as "sister banks" due to their overlapping ownership.

8.    Spirit and Citizens both offered residential warehouse lending—a line of credit through which they loaned money to FMC and other lenders to fund residential mortgages.   Spirit and Citizens each established subsidiaries to manage their residential mortgage financing.   Spirit set up American Southwest Mortgage Corporation ("Spirit/Mortgage Corp.").   Citizens formed American Southwest Mortgage Funding Corporation ("Citizens/Funding Corp.").

9.    Beginning in or about August 2000, FMC entered into a Residential Mortgage Loan Origination and Purchase Agreement that was assigned to Spirit/Mortgage Corp., through which FMC originated mortgages using Spirit/Mortgage Corp.'s line of credit. FMC became Spirit/Mortgage Corp.'s

largest customer, and a participant in its "Gold Star Program," through which Spirit/Mortgage Corp. believed FMC loan files to be complete and accurate.

10.    In or about 2013, Spirit/Mortgage Corp. contributed about $100,000,000.00 of its warehouse line inventory to Citizens/Funding Corp.  In September 2013, FMC entered into a Residential Mortgage Loan Origination and Purchase Agreement with Citizens/Funding Corp.   Thereafter, Citizens/Funding Corp. and Spirit/Mortgage Corp. loaned residential mortgage funds to FMC.

11.    By the terms of FMC's Residential Mortgage Loan Origination and Purchase Agreements with Spirit/Mortgage Corp. and Citizens/Funding Corp., FMC was required to "secure" a loan note by delivering the note to Spirit/Mortgage Corp. or Citizens/Funding Corp. when the loan was originated. FMC was also obligated to repay the loan amount to Citizens/Funding Corp. or Spirit/Mortgage Corp. when that note was sold, refinanced, or otherwise paid off.

12.    Throughout at least 2016, Citizens/Funding Corp. and Spirit/Mortgage Corp. provided FMC with residential mortgage financing.

## COUNTS 1-7
## (Bank Fraud)

13.     The Federal Grand Jury incorporates paragraphs 1-12 by reference.

**Scheme to Defraud Spirit/Mortgage Corp. and Citizens/Funding Corp.**

14.     From in or about 2016 through in or about January 2019, it was part of the scheme to defraud that:

A.     In or about March 2016, an FDIC Risk Management Examination of Spirit/Mortgage Corp. identified internal and quality control weaknesses related to thirty-one loans underwritten and approved by **McCORD**.

B.     In or about that same year, OSBD discovered irregularities with regard to Spirit/Mortgage Corp.'s Mortgage Loan Origination and Purchase Agreement with FMC.   Though the terms of that Agreement required that FMC use Spirit/Mortgage Corp.'s warehouse lending to fund one-to-four family residential properties, **McCORD** had used Spirit/Mortgage Corp. loans to finance commercial properties.   FMC "corrected" the issue by paying off these impermissible loans—i.e., by repaying Spirit/Mortgage Corp. the loaned funds.

C.     In addition, OSBD discovered that **McCORD** had sold loans "out of trust" by failing to repay Spirit/Mortgage Corp. when certain Spirit/Mortgage Corp.-initiated loans were refinanced or otherwise paid off.   At the time of this discovery, FMC carried outstanding balances of about $200,000,000.00 and

5

$140,000,000.00 on the Spirit/Mortgage Corp. and Citizens/Funding Corp. lines of credit, respectively.

D.    These concerning FDIC and OSBD findings prompted further review.  In or about June 2016, Spirit/Mortgage Corp. and Citizens/Funding Corp. hired independent auditors to review the banks' warehouse lines of credit. The auditors discovered that FMC had sold a total of approximately $14,100,000.00 in Spirit/Mortgage Corp. and Citizens/Funding Corp. loans out of trust.  In or about November 2016, **McCORD** sold over $14,000,000.00 in assets to repay FMC's debt to the banks.

E.    At the time of **McCORD**'s approximate $14,000,000.00 payment, Spirit/Mortgage Corp. and Citizens/Funding Corp. believed that **McCORD** had repaid all of the necessary funds.   Nonetheless, the banks hired a Chief Audit Executive, H.L., to implement procedures that would prevent further misuse of FMC-borrowed funds.

F.    Beginning in or about December 2016 and continuing through in or about April 2017, H.L. conducted a complete audit of the lines of credit that Spirit/Mortgage Corp. and Citizens/Funding Corp. provided to FMC.   H.L. discovered that **McCORD** had misappropriated approximately $40,000,000.00 in additional Spirit/Mortgage Corp. and Citizens/Funding Corp. loans by:

6

i.    Using FMC's warehouse line of credit with (i.e., obtaining mortgage loans from) Spirit/Mortgage Corp. or Citizens/Funding Corp., selling those Spirit/Mortgage Corp. or Citizens/Funding Corp. loans to Fannie Mae, then resubmitting the loan documents to Spirit/Mortgage Corp. or Citizens/Funding Corp. to receive additional money from the Spirit/Mortgage Corp. or Citizens/Funding Corp. line of credit;

ii.    Using FMC's warehouse line of credit with Spirit/Mortgage Corp. or Citizens/Funding Corp. to refinance the resulting loans without repaying Spirit/Mortgage Corp. or Citizens/Funding Corp. the originally loaned funds;

iii.    Using FMC's Spirit/Mortgage Corp. or Citizens/Funding Corp. line of credit to fund mortgages to borrowers, receiving payments from those borrowers, but never repaying Spirit/Mortgage Corp. or Citizens/Funding Corp.;

iv.    Obtaining funds from Spirit/Mortgage Corp. or Citizens/Funding Corp. for loans that never closed, then failing to return the funds to Spirit/Mortgage Corp. or Citizens/Funding Corp.; and

v.    Using FMC's warehouse lines of credit with Spirit/Mortgage Corp. and Citizens/Funding Corp. to "double fund" loans by obtaining funds from both financial institutions to fund the same loans.

G.    Based upon these internal findings, representatives from Spirit/Mortgage Corp. and Citizens/Funding Corp. terminated future warehouse lending to FMC, confronted **McCORD**, and attempted to collect the approximate $40,000,000.00 that **McCORD** owed on the out-of-trust loans.

H.    In order to prevent further fraud, Spirit/Mortgage Corp. and Citizens/Funding Corp. implemented new notification requirements on FMC loans.  Spirit/Mortgage Corp. and Citizens/Funding Corp. required **McCORD** to assign FMC-funded mortgages to Spirit/Mortgage Corp. and Citizens/Funding Corp. and file the assignments of mortgages with the geographically appropriate county recorders of deeds.   This was to ensure that the title companies handling these assigned mortgages sent mortgage payments directly to Spirit/Mortgage Corp. and Citizens/Funding Corp.

I.    Despite Spirit/Mortgage Corp. and Citizens/Funding Corp.'s efforts, **McCORD**'s employees contacted the title companies and directed mortgage payoffs to FMC's closing account.   **McCORD** caused FMC to continue to collect mortgage loan payments, without repaying Spirit/Mortgage Corp. and

Citizens/Funding Corp., including on the following loans:

| Appx. Date of Payment to FMC | Transaction Type | Amount | Property |
|---|---|---|---|
| November 22, 2017 | Wire | $277,238.00 | 37 Blacksmith Run Dr. Henderson, NC |
| December 1, 2017 | Wire | $216,752.97 | 3808 Tarmac Dr. Sophia, NC |
| December 11, 2017 | Mailing | $327,282.62 | 6054 Shore Park Dr. Leland, NC |
| March 20, 2018 | Wire | $259,133.76 | 284 Joshua Ridge Rd. Lot 4 Etowah, NC |
| March 29, 2018 | Wire | $280,674.41 | 302 Pebble Beach Dr. Mebane, NC |
| May 24, 2018 | Wire | $432,012.22 | 4341 Cricket Cove Ct. Denver, NC |
| July 6, 2018 | Wire | $251,487.25 | 2925 Hampton Ridge Rd. Fayetteville, NC |

J.      After collecting these loan payoffs, and without notifying Spirit/Mortgage Corp. and Citizens/Funding Corp., **McCORD** signed releases on the assigned mortgages, subjecting the properties to potential foreclosure should Spirit/Mortgage Corp. or Citizens/Funding Corp. try to collect payment on these mortgages, for which they held title.

### Executions of the Scheme to Defraud

15.      On or about the following dates, in the Western District of Oklahoma and elsewhere,

——————————————RONALD J. McCORD,——————————————

with intent to defraud, knowingly executed a scheme and artifice to defraud

Spirit/Mortgage Corp. and Citizens/Funding Corp., federally insured financial institutions, and to obtain moneys, funds, credits, assets, securities, and other property owned by and under the custody and control of Spirit/Mortgage Corp. and Citizens/Funding Corp., by means of materially false pretenses, representations, and promises. In particular, **McCORD** released mortgages on properties that he had assigned to Spirit/Mortgage Corp. and Citizens/Funding Corp. after collecting mortgage payoffs belonging to Spirit/Mortgage Corp. and Citizens/Funding Corp., without conveying the mortgage payoffs to Spirit/Mortgage Corp. and Citizens/Funding Corp., as follows:

| Count | Appx. Date of Release | Owner(s) | Property |
|-------|-----------------------|----------|----------|
| 1 | December 14, 2017 | N.U. | 37 Blacksmith Run Dr. Henderson, NC |
| 2 | December 20, 2017 | M.O. | 6054 Shore Park Dr. Leland, NC |
| 3 | February 2, 2018 | D.F., A.F. | 3808 Tarmac Dr. Sophia, NC |
| 4 | May 22, 2018 | J.F., P.F. | 284 Joshua Ridge Rd. Lot 4 Etowah, NC |
| 5 | May 22, 2018 | R.H., C.H. | 302 Pebble Beach Dr. Mebane, NC |
| 6 | July 16, 2018 | V.N., L.N., M.N., K.S. | 2925 Hampton Ridge Rd. Fayetteville, NC |
| 7 | January 2, 2019 | C.P., S.P. | 4341 Cricket Cove Ct. Denver, NC |

10

All in violation of Title 18, United States Code, Section 1344.

## False Statement to CapLOC, LLC

16.    At all times relevant to this Indictment, CapLOC, LLC ("CapLOC"), was a North Carolina-incorporated mortgage lending business that provided warehouse loans to other mortgage lenders.   T.A. was the President of CapLOC.

17.    In or about early 2017, in light of Spirit/Mortgage Corp. and Citizens/Funding Corp.'s refusal to fund future FMC loans, **McCORD** began negotiations with T.A. and other members of CapLOC management. **McCORD** represented that he would be willing to sell FMC's mortgage lending business, but that he needed quick funding from CapLOC if FMC was to survive in the immediate future.

18.    On or about March 30, 2017, **McCORD** entered into an agreement with CapLOC by which CapLOC agreed to provide **McCORD** with a line of credit to fund new FMC-originated loans while **McCORD** and CapLOC negotiated the terms of CapLOC's acquisition of FMC.   CapLOC entered into a Service Agreement with CBB, Inc. ("CBB") to manage and service the FMC loans that **McCORD** originated with CapLOC funds.

19.    By the terms of the Service Agreement, CBB was required to send

CapLOC a daily list of loans for which **McCORD** requested CapLOC funding. On or about April 26, 2017, a CBB representative sent T.A. and others a list of forty-six loans, totaling approximately $10,690,053.62, for which **McCORD** requested CapLOC funding to originate new FMC loans.

<u>**COUNT 8**</u>
**(False Statement to a Financial Institution)**

20.    The Federal Grand Jury incorporates paragraphs 1, 4, and 16-19 by reference.

21.    On or about April 26, 2017, in the Western District of Oklahoma and elsewhere,

——————————————RONALD J. McCORD——————————————

did knowingly make a false statement for the purpose of influencing the action of CapLOC, a mortgage lending business.   In particular, **McCORD** sent T.A. an email representing that the forty-six loans on the list sent earlier that day were "secondary market eligible," and that **McCORD** was "waiting on the custodian to return the original note."   In truth, **McCORD** had already obtained the funds for these forty-six loans from Spirit/Mortgage Corp. or Citizens/Funding Corp., sold the loans to Fannie Mae, and never repaid Spirit/Mortgage Corp. or Citizens/Funding Corp.   Therefore, as **McCORD** then

12

well knew, these loans were not secondary market eligible, and he did not expect to receive the original notes.

All in violation of Title 18, United States Code, Section 1014.

22.    On or about April 27, 2017, **McCORD** caused CapLOC to wire funds for these loans to Spirit/Mortgage Corp. as payment toward his outstanding debt of approximately $40,000,000.00 in out-of-trust loans.

### Fannie Mae Escrow

23.    The Federal Grand Jury incorporates paragraphs 1, 2, and 4 by reference.

24.    Beginning in 2000, FMC and Fannie Mae signed Seller and Servicing Contracts under which FMC agreed to originate and sell as well as service loans for Fannie Mae.   By the terms of these Contracts, FMC was obligated to maintain two types of custodial accounts, commonly known as "escrow accounts": (1) accounts used to pay borrowers' real estate taxes and mortgage insurance premiums ("T&I accounts") and (2) accounts used to secure borrowers' mortgage principal and interest payments ("P&I accounts").   FMC could not borrow from the escrow funds or use the funds for any other purpose.

25.    In the normal course of business, **McCORD** and FMC received a borrower's mortgage payment, deposited that payment in a clearing account,

and transferred the necessary funds from the clearing account to the escrow accounts for later disbursement of tax, insurance, principal, and interest payments.    FMC, as the servicing company for Fannie Mae, then made payments on the mortgage bills—including annual taxes and insurance premiums—as they became due.    In 2017, through its relationship with Fannie Mae, FMC serviced approximately 12,000 loans worth a total of approximately $1,800,000,000.00.

### Scheme to Defraud Fannie Mae

26.    From in or about Fall 2016 through in or about December 2017, it was part of the scheme to defraud that:

A.    Beginning in late 2016, FMC experienced a cash flow shortage that made it difficult for **McCORD** to meet FMC's operating costs.    To cover the shortage, **McCORD** instructed employees in FMC's accounting department to divert funds intended for the escrow accounts from the clearing account to the operating account.

B.    Despite FMC's financial struggles, **McCORD** treated the operating account as a personal bank account.    After diverting escrow monies from the clearing account, **McCORD** used the diverted funds to pay personal travel

expenses, to build a custom vacation home in Colorado, and for the benefit of family members.

C.    **McCORD** was required to maintain monthly reports detailing the status of the loans that FMC serviced, including the amounts held in the escrow accounts.    **McCORD** failed to inform Fannie Mae of the monthly escrow shortages.

D.    Beginning in or about 2017, **McCORD** stopped transferring the necessary funds to the P&I accounts.    In June and July 2017, **McCORD** diverted a total of approximately $5,000,000.00 from the P&I accounts.

E.    On or about August 2, 2017, Fannie Mae sent **McCORD** a Notice of Breach explaining that FMC had violated the terms of its Selling and Servicing Contract with Fannie Mae, and outlining several new conditions—including the requirement that FMC sell the Mortgage Servicing Rights ("MSRs") for all of its Fannie Mae loans.    On or about August 3, 2017, **McCORD** signed the Notice of Breach and returned it to Fannie Mae, indicating that he agreed to abide by Fannie Mae's new requirements.

F.    Though he had signed the Notice of Breach and agreed to its terms, **McCORD** continued to divert funds intended for the escrow accounts to the operating account, and failed to inform Fannie Mae of the increasing shortages.

G.    FMC accounting employees tracked the T&I diversions internally, listing the diverted amounts as outstanding Fannie Mae Taxes & Insurance deposits in the "other liabilities" section of FMC's financial statements.    At the end of every month, FMC employees tallied the final balance.    By on or about December 5, 2017, **McCORD** had authorized diversions from the T&I accounts that totaled over $28,860,000.00.

H.    Due to the requirements outlined in Fannie Mae's Notice of Breach, **McCORD** began the process of selling FMC's Fannie Mae loan portfolio.    In or about June 2017, **McCORD** contacted T.W., the Vice President of Rushmore Loan Management Services ("Rushmore"), told him that FMC was going out of business, and explained that he planned to put a portfolio of MSRs up for bid. **McCORD** did not tell T.W. about the missing escrow funds.

I.    In or about Fall 2017, **McCORD** officially offered the MSR package for sale.    Rushmore won the bid, and negotiated with Fannie Mae about the risks of purchase.    Fannie Mae, as the current owner of the mortgages, agreed to indemnify Rushmore concerning any issues caused by actions that occurred prior to Rushmore's purchase of the MSRs.

J.    On or about October 31, 2017, Rushmore closed the deal with FMC. As the new servicing company, Rushmore was obligated to make future

16

payments on taxes and insurance premiums from the escrow accounts. By the terms of the sale, **McCORD** was obligated to transfer approximately $22,000,000.00 in escrow funds to Rushmore so that these payments could be made. Prior to closing the deal with Rushmore, **McCORD** provided FMC records that falsely indicated the escrow accounts contained the necessary funds. **McCORD** did not disclose that he had in fact diverted the money from those accounts to cover FMC's financial shortages, as well as for his own personal benefit.

K.     In or about December 2017, T.W. called **McCORD** and asked why Rushmore had not received the escrow funds. **McCORD** admitted that he had used the funds for other purposes, and did not have the escrow money to send.

L.     By the terms of its indemnification agreement with Rushmore, Fannie Mae was obligated to cover the missing escrow funds. Upon learning of the escrow shortage, Fannie Mae immediately wired more than $15,000,000.00 to Rushmore so that borrowers' taxes would be paid.

M.     Soon thereafter, T.W. learned that **McCORD** had bounced checks to more than sixty taxing authorities due to the missing escrow funds. As a result, borrowers throughout the Oklahoma City area and elsewhere missed making their tax payments.

17

N.    In order to cover the missed tax payments from the bounced checks, Fannie Mae wired an additional $5,000,000.00 to Rushmore.

## Executions of the Scheme to Defraud

27.    The Federal Grand Jury incorporates paragraphs 1, 2, 4, and 23-26 by reference.

## COUNT 9
## (Bank Fraud)

28.    On or about January 13, 2017, in the Western District of Oklahoma and elsewhere,

### ————————————————RONALD J. McCORD,————————————————

with intent to defraud, knowingly executed a scheme and artifice to defraud Fannie Mae, a federal financial institution, and to obtain moneys, funds, credits, assets, securities, and other property owned by and under the custody and control of Fannie Mae, by means of materially false pretenses, representations, and promises.    In particular, **McCORD** caused a wire transfer of $125,000.00 of designated escrow funds from the FMC clearing account to the FMC operating account.

All in violation of Title 18, United States Code, Section 1344.

## COUNT 10
### (Money Laundering)

29.    The Federal Grand Jury incorporates paragraphs 1, 2, 4, 23-26, and 28 by reference.

30.    On or about January 13, 2017, in the Western District of Oklahoma and elsewhere,

————————————————RONALD J. McCORD————————————————

knowingly engaged in a monetary transaction through a financial institution, affecting interstate commerce, in criminally derived property worth more than $10,000.00.    In particular, **McCORD** caused a wire transfer of $144,700.90 from the FMC operating account to Beckett Custom Homes as payment toward the construction costs of his Colorado vacation home, after more than $10,000.00 of that amount had been derived from bank fraud, a specified unlawful activity under Title 18, United States Code, Sections 1956(c)(7)(A) and 1961(1).

All in violation of Title 18, United States Code, Section 1957(a).

## COUNT 11
### (Bank Fraud)

31.    The Federal Grand Jury incorporates paragraphs 1, 2, 4, and 23-26 by reference.

32.    On or about January 25, 2017, in the Western District of Oklahoma and elsewhere,

——————————————————RONALD J. McCORD,——————————————————

with intent to defraud, knowingly executed a scheme and artifice to defraud Fannie Mae, a federal financial institution, and to obtain moneys, funds, credits, assets, securities, and other property owned by and under the custody and control of Fannie Mae, by means of materially false pretenses, representations, and promises.   In particular, **McCORD** caused a wire transfer of designated escrow funds, in the amount of $300,000.00, from the FMC clearing account to the FMC operating account.

All in violation of Title 18, United States Code, Section 1344.

## COUNT 12
### (Money Laundering)

33.    The Federal Grand Jury incorporates paragraphs 1, 2, 4, 23-26, and 32 by reference.

34.    On or about January 25, 2017, in the Western District of Oklahoma and elsewhere,

——————————————————RONALD J. McCORD——————————————————

knowingly engaged in a monetary transaction through a financial institution, affecting interstate commerce, in criminally derived property worth more than

$10,000.00.   In particular, **McCORD** caused a wire transfer $20,731.68 from the FMC operating account to Beckett Custom Homes as payment toward the construction costs of his Colorado vacation home, after more than $10,000.00 of that amount had been derived from bank fraud, a specified unlawful activity under Title 18, United States Code, Sections 1956(c)(7)(A) and 1961(1).

All in violation of Title 18, United States Code, Section 1957(a).

### COUNTS 13-14
### (Bank Fraud)

35.   The Federal Grand Jury incorporates paragraphs 1, 2, 4, and 23-26 by reference.

36.   On or about April 28, 2017, in the Western District of Oklahoma and elsewhere,

——————————————————**RONALD J. McCORD,**——————————

with intent to defraud, knowingly executed a scheme and artifice to defraud Fannie Mae, a federal financial institution, and to obtain moneys, funds, credits, assets, securities, and other property owned by and under the custody and control of Fannie Mae, by means of materially false pretenses, representations, and promises.   In particular, **McCORD** caused the following wire transfers of designated escrow funds from the FMC clearing account to the FMC operating account:

21

| Count | Amount |
|:-----:|:------:|
| 13 | $550,000.00 |
| 14 | $550,000.00 |

All in violation of Title 18, United States Code, Section 1344.

## COUNT 15
### (Money Laundering)

37.    The Federal Grand Jury incorporates paragraphs 1, 2, 4, 23-26, and 36 by reference.

38.    On or about April 28, 2017, in the Western District of Oklahoma and elsewhere,



RONALD J. McCORD

knowingly engaged in a monetary transaction through a financial institution, affecting interstate commerce, in criminally derived property worth more than $10,000.00.   In particular, **McCORD** caused a wire transfer of $566,445.55 from the FMC operating account to First American Title & Trust as payment towards the approximate $900,000.00 purchase price of his son's home, after more than $10,000.00 of that amount had been derived from bank fraud, a

specified unlawful activity under Title 18, United States Code, Sections 1956(c)(7)(A) and 1961(1).

All in violation of Title 18, United States Code, Section 1957(a).

## COUNTS 16-17
### (Bank Fraud)

39.     The Federal Grand Jury incorporates paragraphs 1, 2, 4, and 23-26 by reference.

40.     On or about May 24, 2017, in the Western District of Oklahoma and elsewhere,

—————————————————RONALD J. McCORD,—————————————————

with intent to defraud, knowingly executed a scheme and artifice to defraud Fannie Mae, a federal financial institution, and to obtain moneys, funds, credits, assets, securities, and other property owned by and under the custody and control of Fannie Mae, by means of materially false pretenses, representations, and promises.   In particular, **McCORD** caused the following wire transfers of designated escrow funds from the FMC clearing account to the FMC operating account:

| Count | Amount |
|-------|--------|
| 16 | $300,000.00 |
| 17 | $136,500.00 |

All in violation of Title 18, United States Code, Section 1344.

## COUNT 18
### (Money Laundering)

41.    The Federal Grand Jury incorporates paragraphs 1, 2, 4, 23-26, and 40 by reference.

42.    On or about May 24, 2017, in the Western District of Oklahoma and elsewhere,



**RONALD J. McCORD**

knowingly engaged in a monetary transaction through a financial institution, affecting interstate commerce, in criminally derived property worth more than $10,000.00.    In particular, **McCORD** issued a check in the amount of $210,000.00 from the FMC operating account, made payable to **McCORD**, after more than $10,000.00 of that amount had been derived from bank fraud, a specified unlawful activity under Title 18, United States Code, Sections 1956(c)(7)(A) and 1961(1).

All in violation of Title 18, United States Code, Section 1957(a).

## COUNTS 19-20
### (Bank Fraud)

43.    The Federal Grand Jury incorporates paragraphs 1, 2, 4, and 23-26 by reference.

44.    On or about August 7, 2017, in the Western District of Oklahoma and elsewhere,

——————————————**RONALD J. McCORD,**——————————

with intent to defraud, knowingly executed a scheme and artifice to defraud Fannie Mae, a federal financial institution, and to obtain moneys, funds, credits, assets, securities, and other property owned by and under the custody and control of Fannie Mae, by means of materially false pretenses, representations, and promises.   In particular, **McCORD** caused the following wire transfers of designated escrow funds from the FMC clearing account to the FMC operating account:

| Count | Amount |
|-------|--------|
| 19    | $900,000.00 |
| 20    | $250,000.00 |

All in violation of Title 18, United States Code, Section 1344.

## COUNT 21
**(Money Laundering)**

45.    The Federal Grand Jury incorporates paragraphs 1, 2, 4, 23-26, and 44 by reference.

46.    On or about August 7, 2017, in the Western District of Oklahoma and elsewhere,

—————————————————**RONALD J. McCORD**————————————————

knowingly engaged in a monetary transaction through a financial institution, affecting interstate commerce, in criminally derived property worth more than $10,000.00.    In particular, **McCORD** issued a check in the amount of $204,000.00 from the FMC operating account, made payable to **McCORD**, after more than $10,000.00 of that amount had been derived from bank fraud, a specified unlawful activity under Title 18, United States Code, Sections 1956(c)(7)(A) and 1961(1).

All in violation of Title 18, United States Code, Section 1957(a).

## COUNTS 22-23
**(Bank Fraud)**

47.    The Federal Grand Jury incorporates paragraphs 1, 2, 4, and 23-26 by reference.

48.    On or about September 12, 2017, in the Western District of Oklahoma and elsewhere,

——————————————RONALD J. McCORD,——————————————

with intent to defraud, knowingly executed a scheme and artifice to defraud Fannie Mae, a federal financial institution, and to obtain moneys, funds, credits, assets, securities, and other property owned by and under the custody and control of Fannie Mae, by means of materially false pretenses, representations, and promises.    In particular, **McCORD** caused the following wire transfers of designated escrow funds from the FMC clearing account to the FMC operating account:

| Count | Amount |
|-------|--------|
| 22 | $125,000.00 |
| 23 | $200,000.00 |

All in violation of Title 18, United States Code, Section 1344.

## COUNT 24
**(Money Laundering)**

49.    The Federal Grand Jury incorporates paragraphs 1, 2, 4, 23-26, and 48 by reference.

50.   On or about September 12, 2017, in the Western District of Oklahoma and elsewhere,

——————————————————**RONALD J. McCORD**——————————————————

knowingly engaged in a monetary transaction through a financial institution, affecting interstate commerce, in criminally derived property worth more than $10,000.00.   In particular, **McCORD** wired $122,719.13 from the FMC operating account to Beckett Custom Homes as payment toward the construction costs of his Colorado vacation home, after more than $10,000.00 of that amount had been derived from bank fraud, a specified unlawful activity under Title 18, United States Code, Sections 1956(c)(7)(A) and 1961(1).

All in violation of Title 18, United States Code, Section 1957(a).

## FORFEITURE

The allegations contained in this Indictment are hereby re-alleged and incorporated for the purpose of alleging forfeiture.

Upon conviction of any of the offenses alleged in Counts 1-9, 11, 13-14, 16-17, 19-20, and 22-23 of this Indictment, **RONALD J. McCORD** shall forfeit to the United States any property constituting, or derived from, proceeds obtained directly or indirectly, as a result of such offenses.

Likewise, upon conviction of any of the offenses alleged in Counts 10, 12, 15, 18, 21, and 24 of this Indictment, **McCORD** shall forfeit to the United States any property, real or personal, involved in such offenses, or any property traceable to such property.

The property subject to forfeiture includes, but is not limited to:

1.   A sum of money, in the amount of $28,860,000.00, which represents the amount of proceeds obtained by **McCORD** as a result of the offenses; and

2.   Real Property located at 21650 Highway 6, Eagle, Colorado 81631, also described as Lot 8, Red Mountain Ranch, Filing No. 4, according to the plat recorded May 20, 1985 in Book 414, Page 480, County of Eagle, State of Colorado.

Pursuant to Title 21, United States Code, Section 853(p), as adopted by Title 28, United States Code, Section 2461(c), **McCORD** shall forfeit substitute property, up to the value of the property described above if, by any act or omission of defendant, the property described above, or any portion thereof, cannot be located upon the exercise of due diligence; has been transferred or sold to, or deposited with, a third person; has been placed beyond the jurisdiction of the Court; has been substantially diminished in value; or has been commingled with other property that cannot be subdivided without difficulty.

29

All pursuant to Title 18, United States Code, Sections 982(a)(1) and (a)(2),

and Title 28, United States Code, Section 2461.

A TRUE BILL:

FOREPERSON OF THE GRAND JURY

TIMOTHY J. DOWNING
United States Attorney

JULIA E. BARRY
Assistant United States Attorney

30